O

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

|  |  |
|---|---|
|  | Case No.: SA CV 13-0561-DOC (JPRx) |
| **TERRY P. BOYD, ET AL.** | |
| **Plaintiffs,** | |
|  | **ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [268] AND** |
| **vs.** | **DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE** |
| **BANK OF AMERICA CORP., ET AL.,** | **ALTERNATIVE, PARTIAL** |
| **Defendants.** | **SUMMARY JUDGMENT [297]** |

Before the Court are Plaintiffs' Motion for Partial Summary Judgment ("Pls. Mot.") (Dkt. 268) and Defendants' Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Defs. Mot.") (Dkt. 297). Oral arguments were held on April 20, 2015. Having considered the arguments raised by the parties, the Court rules as follows: Plaintiffs' Motion is GRANTED and Defendants' Motion is DENIED. The Court finds that the federal and state administrative and professional exemptions and the federal highly compensated employee exemption are not applicable. As to Defendants' Motion, summary judgment is denied as to Plaintiffs' meal period and rest period claim. In addition, the Court finds that issues of fact exist as to good faith and willfulness. Therefore, summary judgment is denied as to Plaintiffs' itemized wage statement claim and waiting time penalties claim and as to the FLSA's statute of limitations and liquidated damages provisions.

## I.   Background

Plaintiffs are members of a class of current and former residential real estate appraisers ("Appraisers") for Defendant LandSafe Appraisal Services, Inc. ("LAS"). The gravamen of their claims is that LAS misclassified them as exempt from overtime under California and federal law. Plaintiffs and Defendants Bank of America, Corp. ("BAC"), LandSafe, Inc. ("LSI") and LAS have filed cross-motions for summary judgment, primarily regarding the applicability of a number of state and federal overtime exemptions. Defendants also seek summary judgment as to Plaintiffs other state law claims.

### A.  Procedural History

Plaintiffs filed this collective and class action suit on April 9, 2013. Compl. (Dkt. 1). The Second Amended Complaint ("SAC"), filed on June 26, 2013, asserts claims for: (1) violations of Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207; (2) violations of California Labor Code §§ 510, 1194, and 1198, and Industrial Welfare Commission ("IWC") Wage Order(s); (3) failure to provide itemized wage statements, California Labor Code § 226; (4) failure to provide and/or authorize meal and rest periods, California Labor Code §§ 512, 226.7, and IWC Wage Orders; (5) violations of California Business and Professions Code § 17200; (6) waiting time

penalties, California Labor Code § 203; and (7) civil penalties pursuant to Labor Code Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698, *et seq.*

The SAC asserts claims on behalf of two putative classes, (1) individuals that have worked for Defendants during the relevant time period as "Residential Appraisers and other similar positions," and (2) individuals that had worked for Defendants during the relevant time period as "Review Appraisers and other similar positions" ("Review Appraisers"). SAC ¶¶ 1, 20. Plaintiffs allege Defendants maintain a uniform policy misclassifying hundreds of California-based real estate appraisers as exempt. *Id.* ¶ 24. As a result, Plaintiffs maintain, these employees were not paid overtime for long hours and were not provided meal and rest periods, in violation of the California Labor Code. *Id.* ¶ 2. The SAC defines the Collective Class as:

> All persons who are or have been employed by Defendants as Appraisers, including employees with the job title 'Staff Appraiser' 'Residential Appraiser' and any other employee performing the same or similar duties for Defendants and Review Appraisers ('Review Appraiser,' 'Senior Review Appraiser;' or positions consisting of similar job duties) within the United States at any time from three years prior to the filing of this Complaint to the final disposition of this case.

*Id.* ¶ 20. The SAC defines the California Class similarly, but with a four-year statute of limitations. *Id.* ¶ 36. The SAC also defines two sub-classes for the California penalty claims, based on the different statutes of limitations for those claims. *Id.* ¶¶ 37, 38.

The parties have settled their claims regarding Review Appraisers (Dkt. 276). Therefore, the term "Appraisers" in this order refers to the remaining Staff and Residential Appraisers.

Conditional class certification under the FLSA was granted on December 11, 2013 (Dkt. 109). The Court-approved FLSA § 216(b) Notice was mailed to eligible Appraisers nationwide on March 5, 2014. On June 27, 2014, the Court granted Plaintiffs' motion for class certification, and Terry Boyd, Sonia Medina, Ethel Parks, and Linda Zanko were appointed class representatives (Dkt. 232).

Plaintiffs' filed their Motion for Partial Summary Judgment on November 12, 2014. On December 17, 2014, for judicial economy reasons, the Court rescheduled the hearing date for April 20, 2014, and indicated that it wished to hear all dispositive motions together, after the close of discovery. Order, Dec. 17, 2014 (Dkt. 291). Defendants filed their Motion for Summary Judgment on February 20, 2015 (Dkt. 297).

### B. Facts

The pending motions primarily address the application of various FLSA and California overtime exemptions. Many of the facts material to the application of the overtime exemptions turn on the nature of the Appraisers' work, and are undisputed. The Court will reference the Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law ("PUF") (Dkt. 268-2); Defendants' Response to PUF ("DR") and Statement of Additional Material Facts ("DSAM") (Dkt. 278); Defendants' Statement of Uncontroverted Facts and Conclusions of Law ("DUF") (Dkt. 297-2); and Plaintiffs' Response to DUF ("PR") and Statement of Additional Material Facts ("PSAM") (Dkt. 300-1) and will rely on the exhibits and deposition testimony before the Court.

### 1.   Business Structure

LAS is a wholly-owned subsidiary of BAC. PUF 55; DR 55. LAS provides market value appraisals for properties in connection with residential mortgage loan transaction to subsidiaries and divisions of BAC.[1] DUF 1-2. Collectively, BAC and these subsidiaries and divisions will be referred to as Bank of America ("BofA"). BofA is in the business of offering mortgages for residential properties. Valuation opinions (appraisals) are one of the factors that BofA relies on

---

[1] Defendants repeatedly note that at some point, LAS provided appraisal services for non-BofA "customers." In the cited portion of Mr. Nicholson's deposition, he states "I'm aware that our -- that we used to receive appraisal product orders on-line. I am not aware that we still, from outside, outside customers, I don't believe that we receive appraisal orders." Nicholson Dep. at 30:17-20. From that testimony, it is ambiguous what "outside customer" means, or the time period that this refers to. Overwhelming evidence shows that BofA was, if not the exclusive, then the near exclusive recipient of LAS's appraisal services.

to make lending decisions. DUF 4; PR 4. BofA uses appraisals to evaluate risk or exposure for each loan they issue, and consider it as one factor for determining whether the risk level for the loan is acceptable – thereby impacting lending decisions. DUF 25-26. In addition, in order for a mortgage to be eligible for sale in the secondary market to Fannie Mae or Freddie Mac, BofA must obtain an appraisal. PUF 28. Bad appraisals can have negative consequences for BofA, the borrower, and subsequent loan purchasers. DUF 5-6; PR 5. For example, in rare circumstances, BofA may be forced to repurchase the mortgage thereby bearing the cost of default. DUF 30; PR 30; Deposition of Kenneth S. Nicholson, 30(b)(6) Witness for Defendants ("Nicholson Dep.") at 108:25-109:7.

### 2. Job Duties

Appraisers appraise and generate appraisal reports for properties on which BofA offers mortgages. PUF 1; DR 1. Each appraisal report relates to a single BofA mortgage on a single piece of residential property. PUF 2, 8; DR 2. An appraisal is required every time BofA offers a mortgage on a house.

Appraisers, on average, generate around two appraisal reports on a typical workday. PUF 3, DR 3. Appraisal assignments are distributed through an automated software program called the "Appraisal Port." Nicholson Decl. at 158:25. Typically, appraisers have several assignments "in [their] pipeline" at one time. Nicholson Dep. at 251:15-16. Appraisers request a specific capacity, or the number of assignments they are willing to accept to complete in a given geographic area, which is confirmed by their district manager. *Id.* at 276:4-9. However, there is a minimum capacity that Appraisers must be willing to fill. If Appraisers fail to complete an assignment, it may count against them. *Id.* at 276:10-15. Collectively, LAS Appraisers generate 20,000 reports each month. PUF 6.

Appraisers are paid on commission, incentivizing Appraiser productivity. PUF 32. Specifically, for each appraisal produced, Appraisers receive "billings." PUF 37. Appraisers are ranked on their billings, a measure of their production. Nicholson Dep. at 192:3-8. Appraisers' pay is calculated based on their billings, and the quality and the timeliness of their reports.

Nicholson Dep. at 85:3-86:10. If an Appraiser regularly performs below expectations regarding her amount of billings, she may be terminated. *Id.* at 200:12-15, 19.

### 3.    Appraisal Reports

#### a.  Forms

In order to complete an appraisal, the Appraisers complete appraisal reports on uniform appraisal report forms, for example, the Fannie Mae Form 1004 Uniform Residential Appraisal Report. Decl. of Bryan Schwartz in Support of Motion for Partial Summary Judgment ("Schwartz Decl.") (Dkt. 269) Ex. B ("Form 1004"). This form is used in approximately 65% of the appraisals that Appraisers conduct. PUF 12; DR 12. The form lays out the information that the Appraiser must collect concerning the property. Some information may be retrieved from databases (*e.g.*, tax information). Other information must be collected from an in-person inspection (*e.g.*, "description of interior"). Some entries on the form are automated, check-the-box format, others require narrative entries (*e.g.*, "Describe the condition of the property"). In addition, some of the factors are objective (*e.g.*, whether the foundation has a crawl space), some are more subjective (*e.g.*, "Does the property generally conform to the neighborhood…?"). Form 1004 at 1. Appraisers must identify comparable sales ("comparables") and their descriptions on the form. *Id.* at 2. The form has a lengthy section for "additional comments." The form includes the Appraiser's opinion as to the value of the property. *Id.* at 2-3.

#### b.  Deadlines

LAS sets minimum production goals and deadlines for Appraisers. DUF 59, 61; PR 60. This minimum goal could be achieved in about 30 or 40 hours per week of work. Declaration of Michael Carrol ("Carrol Decl.") (Dkt. 280-1) Ex. 3 ¶ 12. Each report must be completed within a certain amount of time. PUF 40. Appraisers typically work out of their homes, and set their own schedule for completing appraisals; although, they have to adhere to the "turn-times." DUF 58, 60; PUF 58; Deposition of Ethel Parks ("Parks Dep.") at 226:4-6. In her deposition, named Plaintiff Ethel Parks explained that at one point she told her manager that due to the strict "turn times," she did not have time to eat lunch or go to the bathroom. Parks Dep. at

225:19- 226:10. Many Appraisers, in contrast, attest that they could take breaks whenever they wanted and had plenty of time to eat during the day, *see, e.g.*, Ashley Decl. ¶ 11; however, there was no written policy for taking breaks. Nicholson Dep. at 189:10-190:23.

### c.  Guidelines

In conducting appraisals, Appraisers must follow standard policies and guidelines. PUF 22; DR 22. The Uniform Standards of Professional Appraiser Practice ("USPAP") represents generally accepted and recognized standards of appraisal practice in the United States.[2] DUF 17. California requires all appraisers to comply with USPAP. DUF 18. LAS and BofA also issue certain guidelines Appraisers must follow in performing their jobs. *See, e.g.*, LAS Appraisal Reporting Requirements – Unacceptable Appraisal Practices ("UAP") (Sealed Dkt. 127) (defining unacceptable comparables); External Circular, Appraisal Reporting Requirements ("External Circular") (Sealed Dkt. 127) (for example, requiring photographs of property). Plaintiff Terry Boyd explained that the guidelines "pretty much standardize[] the appraisal process." Boyd Dep. at 139:2-19. Other Appraisers assert that the regulations still leave room for Appraisers to exercise significant discretion and independent judgment. *See, e.g.*, Carroll Decl. ¶ 7. Michael Carroll, who was a residential staff appraiser, asserts that while "the work of an appraiser is guided by guidelines and company policies, appraisers are expected to go beyond the guidelines whenever necessary to the determination of value." *Id.* ¶ 8.

### d.  Appraisal Process

To generate a report, Appraisers must inspect, research, and analyze a property to develop a valuation opinion. Appraisers spend their days engaged in a variety of activities related to generating a report. For each property, Appraisers have to identify comparable sales. *See, e.g.*, Parks Dep. at 110:15-115:19. To select comparables, Appraisers pull standard data about a property from BofA databases and review closed, pending, and active sales in the

---

[2] The Court takes judicial notice of the Real Property Appraiser Qualification Board Criteria and Interpretations of Criteria and the Uniform Standards of Professional Appraisal Practice ("USPAP") (Dkt. 282). Fed. R. Evid. 201(b).

neighborhood or market area in order to identify three "comparable" sales. *See, e.g.*, *id*. In the process of selecting comparables, Appraisers must make a number of judgments as to market area, and defining the market area. Nicholson Dep. at 316:23-317:1. According to the guidelines, the comparables should be selected from the subject neighborhood when comparable sales or listings are located within the subject neighborhood. *See, e.g.*, Parks Dep. at 115:3-19; UAP at 1. However, under certain circumstances, Appraisers may use their judgment to select properties outside of the neighborhood if there are no comparables within the neighborhood or if the property is unique. Nicholson Dep. at 95:5-13, 320:25-321:5.

Appraisers also typically physically inspect the subject properties. In her deposition, Plaintiff Ethel Parks explained she sometimes spent several hours in a day driving to the subject property. *Id.* at 130:6-8. A physical inspection of the property can take 30 minutes up to several hours for a large mansion. *Id.* at 127:5-8.

After identifying comparables and completing the physical inspection, Appraisers fill out the appraisal report. This takes anywhere from 2-4 hours or more. *Id.* at 148:1-17. The guidelines require certain information be included in the appraisal report, for example photographs and floorplans. *Id.* at 150:5-9; External Circular at 1.

To come up with a final value for a piece of property, there is no exact mathematical formula. DUF 33. Instead, Appraisers apply an extraction method, or "match pair analysis," to generate an estimated value based upon similar properties in the area (the comparables) and a comparison of different qualities or features of the properties. DUF 33; Deposition of Sonia Medina-Kistner ("Medina Dep.") at 100:9-25; Parks Dep. at 138:25-139:17. For example, Appraisers consider property-specific characteristics (whether the property has a swimming pool, the number of bedrooms or bathrooms) as well as local market conditions that could impact demand. Applicable guidelines and the information required on the forms generally determine relevant adjustments to the value of comparable properties in order to generate a final valuation. Deposition of Terry Boyd ("Boyd Dep.") at 191:18-192:17. However, Appraisers must sometimes operate outside of the guidelines when appraising complex or unique properties. *See, e.g.*, Carrol Decl. ¶ 9.

The parties disagree about the relative skill and judgment required to be an Appraiser. Plaintiffs insist that the appraisal process simply involves plugging in numbers and other easily observable data based upon clear guidelines in order to generate an estimate as to property value. *See* PR 53. Defendants argue that an appraisal requires an expert eye, and a keen independent understanding of market conditions, to generate a highly informed valuation opinion. *See, e.g.*, DUF 53. In the Court's view, the truth lies somewhere in the middle. That is to say, generating an appraisal report requires strict adherence to guidelines limiting variables that Appraisers may consider under most circumstances, and at the same time, requires independent judgment and discretion as to how to select the data Appraisers are required to consider (which comparables in what market area?), how to assess market trends (will a closing a factory effect property values in the future?), and generate a final value (what matters more, a sun-deck or a pool; walking distance to a school or a short drive to a grocery store?).

It appears to the Court that what matters, above all, is that Appraisers show their work. With real estate valuation, there is no one "right" answer. A house does not objectively or absolutely "cost" a certain amount. Rather, the value of a home is what one person is willing to pay on a certain day. So an Appraiser gives an informed opinion, not a factual assessment, about the value of the property. It seems that the exact number therefore matters less than the uniform process of getting to the number – a process that BofA can rely on to get supportable results (not results that are necessarily "right" or "wrong"). In the end, an appraisal is one piece of data that BofA considers in making its own judgments about its loans. Those making the lending decisions must have an understanding that an appraisal is not an absolute truth about the value of the property, but is an informed estimate generated by data and human judgment.

### 4.    Review Process

After completing a report, the Appraiser submits the report for review. PUF 14. All of the reports are subject to automated review. *Id.* at 356:7. The automated review process checks for obvious errors or omissions, for example, failing to sign a report or whether the appraised value falls within the adjusted sale prices of "comparable sales." *Id.* at 357:20-21, 358:5-8. Issues like this will be sent back to the Appraiser. *Id*. Approximately 30% of appraisals are

manually reviewed by Review Appraisers or managers. *Id.* at 356:14-16. If a reviewer finds an error in a report, the report can be rejected, and the Appraiser will typically address the error. *Id.* at 317:9-11. On rare occasions, the reviewer may ask for more information, for example, more comparables or pictures. Parks Dep. at 166:21-167:7. Repeated errors will affect the Appraiser's compensation. Nicholson Dep. at 85:24-86:5.

After the report is reviewed, LAS certifies the Appraiser's valuation opinion and it is incorporated into BofA's loan package. Nicholson Dep. at 156:24-157:7; DUF 23. In the end, BofA charges its customers (the borrowers) a fee for the appraisal, typically in the amount of $400. PUF 30.

## 5.     Communication with Management

Appraisers do not regularly communicate directly with management. According to a corporate program, Appraisers may provide feedback on issues of concern, but it is not part of their general job duties. Nicholson Dep. 132:7-133:5. Appraisers do not communicate directly with BofA's loan officers who determine whether to issue loans. PUF 19, DR 19. Appraisers also do not communicate with eventual borrowers/homeowners. PUF 20. Finally, Appraisers do not supervise anyone. PUF 16.

## 6.     Training

No degree beyond a high-school diploma or GED is required to become an Appraiser. PUF 42. Many appraisers do not have college degrees, and those who do have obtained them in a wide variety of topics. PUF 43-44.

To become a real estate appraiser, class members undergo several weeks of classes and extensive on-the-job training.

Appraisers must be licensed by their state. PUF 46.

Federal law tasks the Appraiser Qualification Board ("AQB") with implementing minimum standards for appraisers across the country. DUF 9. The standards currently require 150 total hours of classroom training, along with 2,000 hours of supervised on-the-job experience, and passage of the state test to qualify for a standard residential appraisal license. PUF 47; Schwartz Decl. Ex. G (AQB Standards). Each state must implement appraiser

certification requirements that meet the education requirements issued by the AQB. DUF 10. All states in which Plaintiffs are located require approximately the same classroom hours and hours of on-the-job experience to obtain a residential appraiser license, except that some states recognize only a "certified" residential license, which requires more class hours and more experience hours than a regular license. PUF 48. Since 2009, LAS has sought to hire only "certified" appraisers. DR 47. Certified appraisers must complete 200 hours of core curriculum, hold a 2-year associate's degree or equivalent, and have 2,500 hours of on-the-job experience. DUF 15; PUF 52. The class includes both certified and non-certified appraisers. PUF 50.

## II.      Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible

evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

### III.   FLSA and California Wage Order Exemptions

Defendants claim that class members are not owed overtime because they fall under a number of overtime exemptions; Plaintiffs argue these exemptions are inapplicable.[3]

When the material facts are undisputed, "[t]he question whether [employees'] particular activities excluded them from overtime benefits of the FLSA is a question of law." *Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1068 (9th Cir. 1990). An "employer who claims an exemption from the FLSA has the burden of showing that the exemption applies." *Webster v. Pub. Sch. Employees of Washington, Inc.*, 247 F.3d 910, 914 (9th Cir. 2001) (citing *Donovan v. Nekton, Inc.*, 703 F.2d 1148, 1151 (9th Cir. 1983) (per curiam)). The FLSA "is to be liberally construed to apply to the furthest reaches consistent with Congressional direction. To that end, FLSA exemptions are to be narrowly construed against employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit." *Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000) (citations omitted); *see also Haro v. City of Los Angeles*, 745 F.3d 1249, 1256 (9th Cir.) *cert. denied sub nom. City of Los Angeles, Cal. v. Haro*, 135 S. Ct. 138 (2014); *Webster*, 247 F.3d at 914.

Under the FLSA, the minimum wage and maximum hour requirements do not apply to "any employee employed in a bona fide … administrative or professional capacity." 29 U.S.C. § 213(a)(1). Highly compensated employees who regularly perform any of the duties of

---

[3]Plaintiffs in their Motion address a number of exemptions not raised in Defendants' Motion. As it appears that the Defendants are not invoking those exemptions, these arguments will not be addressed and arguments as to these exemptions are considered waived.

employees which are exempt under the administrative or professional exemptions are also exempt. 29 C.F.R. § 541.601.

The California Industrial Welfare Commission ("IWC") "is the state agency empowered to formulate regulations (known as wage orders) governing minimum wages, maximum hours, and overtime pay in the State of California." *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 795 (1999) (citation omitted). The IWC issues different wage orders for different industries. "The IWC's wage orders, although at times patterned after federal regulations, also sometimes provide greater protection than is provided under federal law in the Fair Labor Standards Act (FLSA) and accompanying federal regulations." *Id.* (citations omitted).

Similar to federal regulations, the Industrial Welfare Commission's Wage Order 4-2001, 8 Cal. Code Regs. § 11040, which applies to professional, technical, clerical, mechanical, and similar occupations, exempts from California's overtime requirements, all "persons employed in administrative … or professional capacities." California does not have an equivalent highly compensated employee exemption.

Defendants argue that Appraisers fall under: (1) the federal and state administrative exemptions; (2) the federal and state professional exemptions; and (3) the related federal highly-compensated employee exemption. Plaintiffs assert that none of these exemptions apply.

**A. Administrative Exemption**

**1. In General**

California and federal law exempt administrative employees from overtime requirements. The FLSA defines an "employee employed in a bona fide administrative capacity" as any employee:

(1) Compensated on a salary or fee basis …;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200 (current). Wage Order 4-2001 ("Wage Order") specifies that the administrative exemption is to be construed according to the specific FLSA regulations operative as of the effective date of the order, 29 C.F.R. § 541.200-205 (2000). Section 1(A)(2) of the Wage Order contains substantially similar elements as the current federal regulation, despite applying different versions of the FLSA regulations. *Rincon v. Am. Fed'n of State, Cnty., & Mun. Employees*, 2013 WL 4389460, at *17 (N.D. Cal. Aug. 13, 2013) (The state law test "closely parallels the federal regulatory definition of the same exemption." (quoting *Combs v. Skyriver Commc'ns, Inc.*, 159 Cal. App. 4th 1242, 1255 (2008))). Therefore, the Court will consider the state and federal administrative exemptions together.

Application of the administrative exemption turns on the specific duties of the employee(s) in question. Section 541.203 provides a number of examples of positions that are generally exempt or non-exempt under the administrative exemption. For example,

> insurance claims adjusters generally meet the duties requirements for the administrative exemption…if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

29 C.F.R. § 541.203(a).

Employees in the financial services industry also generally meet the duties requirements for the administrative exemption if their duties include work "such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products." 29 C.F.R. § 541.203(b). The regulation clarifies that the exemption would generally not apply to "an employee whose primary duty is selling financial products." *Id.*

Human resources employees may qualify for the exemption. 29 C.F.R. § 541.203(e). Those who "formulate, interpret or implement employment policies and management consultants who study the operations of a business and propose changes in organization generally meet the duties requirements for the administrative exemption." *Id.* Those who perform more ministerial roles, however, typically will not qualify for the exemption. For example, "personnel clerks who 'screen' applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet the duties requirements for the administrative exemption." *Id.* These clerks lack discretion. "Such personnel clerks typically will reject all applicants who do not meet minimum standards for the particular job or for employment by the company. The minimum standards are usually set by the exempt human resources manager or other company officials, and the decision to hire from the group of qualified applicants who do meet the minimum standards is similarly made by the exempt human resources manager or other company officials." *Id.* However, "when the interviewing and screening functions are performed by the human resources manager or personnel manager who makes the hiring decision or makes recommendations for hiring from the pool of qualified applicants, such duties constitute exempt work, even though routine, because this work is directly and closely related to the employee's exempt functions." *Id.*

In contrast, "[o]rdinary inspection work generally does not meet the duties requirements for the administrative exemption." 29 C.F.R. § 541.203(g). Because "[i]nspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been catalogued and described in manuals or other sources," they generally "rely on techniques and skills acquired by special training or experience." The administrative exemption is inappropriate because, while "[t]hey have some leeway in the performance of their work" it is "only within closely prescribed limits." *Id.*

Similarly, "examiners or graders, such as employees that grade lumber, generally do not meet the duties requirements for the administrative exemption." 29 C.F.R. § 541.203(h). These employees "usually perform work involving the comparison of products with established standards which are frequently catalogued." *Id.* The regulations acknowledge that "[o]ften, after

continued reference to the written standards, or through experience, the employee acquires sufficient knowledge so that reference to written standards is unnecessary." *Id.* However, "[t]he substitution of the employee's memory for a manual of standards does not convert the character of the work performed to exempt work requiring the exercise of discretion and independent judgment." *Id.*

Also, "public sector inspectors or investigators of various types, such as fire prevention or safety, building or construction, health or sanitation, environmental or soils specialists and similar employees, generally do not meet the duties requirements for the administrative exemption because their work typically does not involve work directly related to the management or general business operations of the employer." 29 C.F.R. § 541.203(j). Even though their work may be complex, "[s]uch employees also do not qualify for the administrative exemption because their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met." *Id.*

Courts give deference to the "DOL's interpretation of its own regulations," including the examples contained in § 541.203. *In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119, 1129 (9th Cir. 2007). Therefore, in applying the administrative exemption, courts typically consider the regulatory language and compare the examples identified in the regulation to job positions at issue in the litigation. *See, e.g.*, *id.*

### 2. Application

The parties agree that Appraisers meet the salary basis requirement for the administrative exemption. Thus, the Court will only analyze the two "duties" prongs of the administrative exemption, taking into account the examples above.

### a. Directly Related to Management Policies or General Business Operations

The "directly related" prong has two subparts. Plaintiffs do not contest that Appraisers' primary duty involves office or non-manual work. Pls. Opp'n at 8. Therefore, the Court concludes that the first subpart of the "directly related" test is satisfied.

The parties dispute whether the second subpart is met. Defendants contend that Appraisers' work is directly related to LAS or LAS's clients' general business operations. Wage Order § 1(A)(2)(a)(1) and (f); 29 C.F.R. § 541.200. Plaintiffs disagree.

### i. Legal Standard

The 2000 DOL regulations explain the "directly related" prong as follows:

(a) The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating to the administrative operations of a business as distinguished from "production" or, in a retail or service establishment, "sales" work. …

(b) The administrative operations of the business include the work performed by so-called white-collar employees engaged in "servicing" a business, as, for [ ] example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control....

(c) As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those [sic] work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

29 C.F.R. § 541.205 (2000). The California law specifies that its administrative exemption be construed according to the federal regulation operative at the time it went into effect in 2001. Wage Order § 1(A)(2)(a)(1).

The current DOL regulations, effective since 2004, are substantially similar:

(a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

(b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

(c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

29 C.F.R. § 541.201 (current).

Therefore, in assessing the application of this prong of the administrative exemption, courts consider the employees' primary duty and determine whether it relates to "assisting with the running or servicing of the business." *Id.* The so-called production/administrative dichotomy may be helpful in making this determination. *Webster*, 247 F.3d at 916. "The administration/production distinction … distinguishes between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself.'" *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) (quoting *Bratt*, 912 F.2d at 1070).

### ii.   Analysis

The parties disagree about the applicability of the second element of the administrative exemption, which requires the employee's work be directly related to the management or general business operations of the employer or the employer's customers. Defendants raise three arguments as to why they believe Appraisers' primary duty is directly related to the management or general business operations of the employer or the employer's customers. First, they argue that Appraisers are essentially "advisers" to LAS and BofA. Second, they argue that Appraisers' reports are essentially "business research" guiding the policies of LAS or BofA. Third, they argue that Appraisers are the "representatives of LAS" who are presented to LAS's customers and the public.

Plaintiffs, on the other hand, argue that Appraisers are essentially engaged in the production work of LAS – generating appraisals. They note that Appraisers do not impact policy decisions of LAS or BofA or the direction of the business. Also, as Appraisers are not in contact with loan officers or borrowers, they do not "represent" the company or BofA to the public.

The Court agrees with Plaintiffs.

Defendants explain that "LAS's customers are mortgage lenders" who rely on the Appraisers' "expert advice and opinions" in making lending decisions. Def. Mot. at 9-10.

Therefore, they argue this "advisory and consulting service" amounts to assisting with the running or servicing of the business itself. *Id.*

The Court disagrees that Appraisers engage in advisory and consulting services, consistent with 29 C.F.R. §§ 541.201(c) (current) and 541.205(c) (2000). The language of the regulation and case law make clear that "advisory and consulting services" is inapplicable to employees who are engaged in the core, day-to-day business of the employers.

First, the current regulations identify "tax experts or financial consultants" as the type of advisers envisioned by the regulation. 29 C.F.R. § 541.201(c) (current). Tax and financial consulting is a form of specialized expertise meant to guide the policies of a business.

Similarly, the Ninth Circuit has concluded, "'advising the management' as used in [§541.205] is directed at advice on matters that involve policy determinations, *i.e.*, how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation." *Bratt*, 912 F.2d at 1070. LAS's Appraisers collectively generate thousands of reports a month; each individual Appraiser generates two reports a day, on average. Their work is integrated into the day-to-day core product and constitutes the essential service offered by LAS – real estate appraisals. Therefore, "the work of the [Appraisers] primarily involves the day-to-day carrying out of [LAS's and BofA's business] affairs, rather than running the business itself or determining its overall course or policies." *Id.* Therefore, the Appraisers do not act as a consultants or advisers for the purposes of the administrative exemption.

Defendants also argue that Appraisers perform "business research" which is covered by the state and federal administrative exemption. 29 C.F.R. § 541.205(b) (2000). Defendants point to the fact that Appraisers gather and analyze data to provide their opinions of the fair market value of properties for LAS's customers. The 2000 regulation provided: "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for, example, advising the management,

planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205 (b) (2000).[4]

To support their argument that conducting research constitutes an exempt activity, Defendants cite to this Court's decision in *Reber v. AIMCO/Bethesda Holdings, Inc.*, 2008 WL 4384147, at *5 (C.D. Cal. Aug. 25, 2008). In finding that a genuine issue of fact existed as to whether plaintiff's work as a director of construction fell under the administrative exemption, the Court concluded that "employees that engage in detailed analysis of facts and their import, or high-level planning and implementation are considered administrative." *Id.* (citing 29 C.F.R. § 541.203 (a)-(c)).

In proposing this general statement, the Court considered three of the examples contained in § 541.203 of positions that are presumptively exempt: (1) insurance claims adjusters; (2) employees in the financial services industry; and (3) an employee who leads a team of other employees to complete major projects. As subsection (3) is clearly inapplicable because Appraisers do not supervise anyone or lead other employees, the Court will look to whether the positions of claims adjusters or those in the financial services industry are analogous to the positions of Appraisers. Both positions are clearly distinguishable. The regulations provide that these positions are presumptively exempt given a number of determinative factors, which include both the analysis of factual information in addition to broader representation of the company. For example, claims adjusters may be exempt where

---

[4] The 2004 versions of the regulations removed the reference to "business research." However, the Final Rule clarified that the removal of this language did not imply business research was no longer an exempt activity. "As explained in the 1949 Weiss Report, the administrative operations of the business include the work of employees 'servicing' the business, such as, for example, 'advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.' 1949 Weiss Report at 63. Much of this work, but not all, will relate directly to management policies." Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees ("Final Rule"), 69 Fed. Reg. 22,122-01 (Apr. 23, 2004) (to be codified at 29 C.F.R pt. 541).

they negotiate settlements with insurance policy holders and make recommendations regarding litigation on behalf of their employer. Likewise, financial services employees are typically exempt where they directly advise customers regarding the advantages and disadvantages of different financial products and "market[], servic[e] or promot[e] the employer's financial products." *Id.*

Therefore, review of these examples demonstrate that analysis of facts and making conclusions is not in itself sufficient to render an employee exempt; there must also be an application of those facts to the employer's or customer's general business operations, such that the employee can be said to be "servicing" the business. Appraisers' duties, producing real estate appraisals, do not mirror the characteristics of claims adjusters and financial services workers who exercise direct control and input over the direction of the business or meaningful and varied business decisions. In that way, Appraisers are more similar to public sector inspectors or investigators. Even though these positions require the detailed analysis of facts, they "generally do not meet the duties requirements for the administrative exemption because their work typically does not involve work directly related to the management or general business operations of the employer." 29 C.F.R. § 541.203(j). Appraisers are not exempt as employees who primarily engage in "business research," as the research and analysis of facts that Appraisers conduct is not related to the servicing of LAS's or BofA's business.

Defendants also cite to *Reyes v. Hollywood Woodwork, Inc.*, 360 F. Supp. 2d 1288, 1292 (S.D. Fla. 2005), for the proposition that conducting research qualifies employees for the administrative exemption. In *Reyes*, the court applied the production/"general business operations" dichotomy to analyze whether plaintiff fell under the administrative exemption. The court  looked to the scope of the employee plaintiff's activities, and concluded those activities were limited to preparing bids which promoted and planned sales while the employer defendant was in the business of selling and producing woodwork. The Court held "as a matter of law, that the preparation of the bids is not sales or production work, but rather is an important part of general business operations necessary for the Defendants to obtain production work and sell their products." *Id.* at 1292.

*Reyes* is distinguishable. LAS is in the business of generating appraisal reports. Appraisers perform the investigations and provide the analysis necessary to generate the market valuations of the residential properties. Therefore, rather than involve the "general business operations" of LAS, the preparation of appraisal reports constitutes the "production work" of LAS.[5] In coming to this conclusion, the Court acknowledges that preparing the appraisal reports requires a great deal of skill and the application of expertise. Nevertheless, this does not change the fact that the appraisal reports were, at core, the "product" that was delivered by LAS to BofA. In that sense, Appraisers were not servicing LAS's business through "business research," the generation of their reports. Rather, the reports themselves constituted LAS's business.

Defendants also contend that Appraisers "represent" LAS to its customers through their appraisals, and therefore are involved in servicing the business. 29 C.F.R. § 541.205(b) (2000). "Appraisers' independent opinion becomes LAS's official valuation of a property, and becomes part of a loan package for the life of a loan, even if it is subsequently sold." Def. Mot. at 11. Therefore, any mistakes in the appraisals may subject the loan seller to liability, including

---

[5] The application of the dichotomy here is less strained than in *Webster* or other cases involving the modern service economy. *Webster*, 247 F.3d at 916  (finding plaintiff, a field representative for a labor union, was non-exempt, and his proposed application of the administrative work/production dichotomy was not supportable because, by describing bargaining units solely as units of production, it would render the distinction between administrative work and production meaningless); *see also Roe-Midgett*, 512 F.3d at 872 (considering the position of a claims-adjuster, noting "the so-called production/administrative dichotomy—a concept that has an industrial age genesis—is only useful by analogy in the modern service-industry context"). In each of those cases, it was difficult to identify a "production unit" separate from the business itself. Here in contrast, LAS produces easily-identifiable "units" – appraisal reports – generated by the Appraisers and separate from the administration of the business.

repurchasing the loan. *Id.* Defendants maintain that Appraisers are thus the "representative[s] of LAS that it presents to its customers."[6] *Id.*

To support this position, Defendants argue that appraisers are analogous to claims adjusters. Most courts considering the job duties of insurance claims adjusters conclude that they are exempt under the administrative exemption. For example, the Seventh Circuit in *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 871 (7th Cir. 2008), concluded that plaintiff, a material damage appraiser ("MDA") for an insurance company, was an exempt administrative employee. MDAs "[we]re responsible for investigating auto accident damage, making repair or replacement determinations, drafting estimates, and settling claims of up to $12,000 where liability has been established and coverage approved." *Id.* at 868. The court considered the fact that "[MDAs] spend most of their time in the field and represent the 'face' of [employer] CCS to the claimants and mechanics with whom they interact." *Id.* at 871. "CCS's customers [we]re insurance companies in the business of selling policies, and employees who process[ed] claims against those policies [we]re performing an administrative function for CCS's customers (i.e., a task that administer[ed] the policies 'produced' by the insurers)." *Id.* at 872. So, in *Roe-Midgett*, the customer (insurance company) actually produced the end product (the insurance policy) that the employee administered. The insurance policy was sold to outside insureds, and the MDA's duties involved contact with these claimants and third-party mechanics, thus becoming the face of the insurance company.

---

[6] Defendants make this argument premised on the fact that BofA is LAS's "client" and, therefore, that Appraisers "represent the company" through their contact – in the form of their appraisals – with BofA. In response, Plaintiffs note that BofA and LAS are in a parent/subsidiary relationship, not a true "client" or "customer" relationship. In essence, Plaintiffs maintain, BofA is more analogous to an employer than a customer. The Court agrees with the Plaintiffs. LAS and BofA are part of a single business unit. LAS, as the wholly owned subsidiary of BAC, operates as an arm of BAC's overall mortgage-lending business. The line of cases interpreting the 2000 regulatory language in regards to representing the company have necessarily looked to whether the employees interface with parties outside of the business operation of the employer.

In the present case, LAS generates appraisals and BofA issues loans. Unlike the MDAs in *Roe-Midgett*, the Appraisers do not administer the product generated by BofA (the mortgage loan), nor do they have contact with the end "consumer" of BofA's product or any third party outside of the corporate family. Indeed, while BofA receives LAS's product (the appraisals), the Appraisers themselves have no or little contact with BofA. The appraisals become a component part of the end product that enters the market. LAS's product (appraisal reports) – not the Appraiser – is presented to the public. Defendants' argument that Appraisers themselves represent the company therefore falls short. Mot. at 12 ("As Appraisers' stated opinion of the value of a property is held out to the public, and Appraisers may be called upon to defend these opinions on behalf of LAS or its customers [BofA], Appraisers necessarily 'represent' … both LAS and, potentially, LAS's customers.").[7] In light of the nature of LAS and BofA's business, Appraisers are not the "face" of LAS or BofA, and do not therefore "represent" LAS or LAS's customers.

Likewise, *Rincon*, cited by the Defendants, is clearly distinguishable. In finding that plaintiff, a union organizer, was an exempt administrative employee, the court looked to the plaintiff's extensive contacts with third parties. "[Plaintiff's] primary duty as an Organizer was to represent and promote [the union]. [Plaintiff's] activities focused on increasing [the union's] membership and, through that, its bargaining strength. As an Organizer, [plaintiff] was sent out into the community to speak with employees about [the union]." *Rincon*, 2013 WL 4389460, at *19. In contrast, here, Appraisers do not "represent and promote" LAS or BofA – and, in fact, have little to no contact with third-parties. Indeed, it is the appraisal report, not the Appraiser, that is presented to BofA, and eventually passed on to a borrower as part of a loan package.

---

[7] Defendants cite to the fact that on two occasions, Plaintiffs "testified [as] expert witnesses regarding property valuation." Defs. Mot. at 12 (citing DUF 30). This appears to be such a rare occurrence that it cannot be said to constitute any regular part of Appraisers' duties. It is comparable to a factory worker who is called to testify as to a defective consumer good, and the quality measures in place to protect against such failures. The fact that the worker testified about the one good that failed out of thousands does not transform the worker into the face of the company.

This case does not support a conclusion that Appraisers duties relate to "running and servicing" LAS's business.

Appraisers' work does not involve "tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; [or] legal and regulatory compliance." 29 C.F.R. § 541.201(b) (current). In oral arguments, Defendants contended that Appraisers' work is "functionally similar" to these activities, but failed to articulate specifically how the job duties of Appraisers actually align with the job duties of those involved in budgeting, auditing, compliance, finance, or procurement. The fact that their work "touches on" job duties of those in these fields is insufficient to trigger the exemption. *See Klem*, 208 F.3d at 1089 ("FLSA exemptions are to be narrowly construed against employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit.").

The Court finds that Appraisers' work is best understood as production work. LAS's primary business is generating appraisal reports. While Appraisers' duties involve analytical thinking to generate a valuation and complete a report, in the end, Appraisers present a piece of LAS's primary product: a report detailing an opinion as to the market value of a piece of real estate and the written support for that opinion. Appraisers are not evaluated for their inter-personal skills or their ability to drum up business for LAS or BofA; they are assessed based upon the number and quality of reports that they generate. Appraisers do not generally provide advice on matters that involve policy determinations "*i.e.*, how a business should be run or run more efficiently." *Bratt*, 912 F.2d at 1070. Appraisers produce one piece of data that BofA takes into account when making lending decisions. Appraisers do not provide general research on LAS or BofA's business – for example, by providing research on the efficacy of appraisal techniques.

The undisputed facts establish, therefore, that Appraisers are not "servicing" the business. Appraisers are more like production workers than administrative workers. Thus, the

Court concludes Appraisers' work is not directly related to LAS or LAS's clients' general business operations, under either the California or federal standard.

Defendants have not met their burden of demonstrating that Appraisers' work directly relates to management policies or general business operations of LAS or BofA. Wage Order § 1(A)(2); 29 C.F.R. § 541.200. Plaintiffs have met their burden in establishing that the undisputed facts show that the exemption is not applicable. Therefore, the Court finds that Appraisers do not fall under the federal or state administrative exemption, and summary judgment as to this issue is appropriate.

### b.   Discretion and Independent Judgment with Regards to Matters of Significance

As Defendants' have not met the "directly related" prong of the test, the administrative exemption is not applicable. Nevertheless, the Court will consider the final prong of the test, whether Appraisers exercised discretion and independent judgment with regards to matters of significance. 29 C.F.R. § 541.207 (2000); 29 C.F.R. § 541.202 (current).

### i.   Legal Standard

This test has two related parts. First, courts look to whether an employee exercised any discretion and independent judgment. If so, courts must consider whether that discretion and independent judgment was exercised with regards to or in relation to matters of significance.

The first part of the test is the exercise of discretion and independent judgment. The exercise of discretion and independent judgment involves "the comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207 (2000); 29 C.F.R. § 541.202(a) (current); *Bothell*, 299 F.3d at 1129 ("The requirement that the employee 'customarily and regularly exercise [ ] discretion and independent judgment' is satisfied if the employee has the ability to compare, evaluate, and choose from possible courses of conduct." (quoting 29 C.F.R. § 541.207(a) (2000))).

The second part of the test assesses the context of that discretion and independent judgment. The exercise of discretion and independent judgment must be "free from immediate

direction" and relate to work that is of "substantial importance" or with regards to "matters of significance." *Id.*; *see also* 29 C.F.R. § 541.202(a), (c). Although the California regulations and the current FLSA regulations use slightly different terms, the DOL has explained that the two phrases "describe the same general concept – that the work performed by an exempt administrative employee must be significant, substantial, important, or of consequence to an employer or the employer's customers." Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees ("Final Rule"), 69 Fed. Reg. 22,122-01, 22,143 (Apr. 23, 2004) (to be codified at 29 C.F.R pt. 541). The Ninth Circuit has clarified that courts must assess not only whether an employee exercised discretion over decisions, but "the importance of the decisions over which [the employee] had control." *Bothell*, 299 F.3d at 1129.

The Ninth Circuit has recognized that the issue of "substantial importance" may be difficult to resolve. *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 832 (9th Cir. 2011).

> The former federal regulations incorporated by the administrative exemption include several examples of administratively exempt white-collar employees, including tax consultants, wage-rate analysts, analytical statisticians, claim agents, and "many others." 29 C.F.R. § 541.205(c)(3), (5). In contrast, the examples of non-exempt employees are predominately clerical—bookkeepers, secretaries, messengers, and other "clerks of various kinds." *Id.* § 541.205(c)(1)-(2).

*Id.*

The regulation provides that "[t]he phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202 (current). It provides a number of factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance including, but not limited to:

> (i)     whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;
>
> (ii)    whether the employee carries out major assignments in conducting the operations of the business;
>
> (iii)   whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
>
> (iv)    whether the employee has authority to commit the employer in matters that have significant financial impact;
>
> (v)     whether the employee has authority to waive or deviate from established policies and procedures without prior approval;
>
> (vi)    whether the employee has authority to negotiate and bind the company on significant matters;
>
> (vii)   whether the employee provides consultation or expert advice to management;
>
> (viii)  whether the employee is involved in planning long- or short-term business objectives;
>
> (ix)    whether the employee investigates and resolves matters of significance on behalf of management;
>
> (x)     and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

"Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required." Final Rule, 69 Fed. Reg. at 22,143.

### ii.    Analysis

Defendants claim that Appraisers regularly exercise discretion and independent judgment. The thrust of the "discretion and independent judgment" that Defendants point to is in Appraisers' ability to conduct appraisals how they see fit. For example, Defendants note that Appraisers must determine which variables to consider, which comparables to use, and how to adjust a valuation based on the data they gather.

Plaintiffs focus on the narrow constraints within which appraisers operate. While Appraisers have some discretion over comparables, they also must usually select comparables within very specific guidelines. Additionally, Plaintiffs point to the specific standards guiding Appraisers, and limiting the factors that they can consider in coming to their determinations about the valuation of real estate. Most notably, Plaintiffs highlight the form Appraisers use to write up their appraisals. Each factor Appraisers must consider is specifically laid out, Plaintiffs suggest, with little room for independent discretion or judgment.

First, as to whether discretion and independent judgment existed, the Court finds an analogy to a simpler appraiser position to be helpful. In assessing the job of an automobile damage appraiser, one court described the job as follows:

> The handbook states that the essence of an appraiser's job is "the determination of facts, and in making their estimates they are guided primarily by their skill and experience and by written manuals of established labor and material costs." ... Any discretion the appraisers exercise during negotiations fails to rise to the level required for application of the statutory administrative employee exemption. The essence of the appraisers' duties involve fact finding to determine the cost of repair. They are guided in those duties by skill and experience and by manuals which provide established labor and material costs. While the adjusters negotiate and settle claims with the insured and deal with issues of coverage or liability, the appraisers are the fact finders.

*Reich v. Am. Int'l Adjustment Co.*, 902 F. Supp. 321, 324 (D. Conn. 1994) (citations omitted).

In contrast, real estate appraisers are engaged in much more complex and opinion-based work. An Appraiser is "one who is expected to perform valuation services competently and in a manner that is independent, impartial, and objective." USPAP at U-1. A valuation service pertains to aspects of the property value, which is, of course, "an economic concept." *Id.* at U-4. Therefore, "it is never a fact but always an opinion of the worth of a property at a given time in accordance with a specific definition of value." *Id.* Thus, unlike appraising the damage done to automobiles, which can be boiled down to a raw number – how much will this car *in fact* cost to fix; real-estate appraisal is more ephemeral.

Appraisers must fill out substantial, subjective narratives describing a piece of real property; they must select appropriate comparables to estimate a home's value; they must also weigh different factors in assessing a home's value: one can foresee an appraiser assessing whether the proximity to a school can overcome the view of the nearby freeway, whether a general market downturn will affect property values in a certain region. Considering the description of Appraisers' work, it appears that Appraisers regularly exercise some discretion and independent judgment in conducting appraisals. They are developing informed opinions, not simply investigating an objectively determinable fact.

However, the DOL regulations warn against "confusing 'the exercise of discretion and independent judgment' with 'the use of skill in applying techniques, procedures, or specific standards.'" *Bothell*, 299 F.3d at 1129 (quoting 29 C.F.R. §§ 541.207(b)(1) and (c) (2000)).

Appraisals are central to LAS's business. However, in order to qualify for the exemption, Defendants must show that Appraisers' primary duty (conducting appraisals) includes the exercise of discretion and independent judgment with respect to or pertaining to matters of significance. 29 C.F.R. § 541.200(a)(3). Therefore, the Court must assess not only whether an employee exercises discretion over decisions, which they do, but "the importance of the decisions over which [the employee] ha[s] control." *Bothell*, 299 F.3d at 1129.

Plaintiffs argue that the exercise of discretion is not exercised with respect to matters of significance. In contrast, Defendants argue that "Appraisals are central to LAS'[s] business and critical to the business operations of [BofA], as [BofA] must have a professional opinion of

value for every property for which they write a loan…" Defs. Mot. at 13. The essence of Defendants' suggestion is that, because appraisals are important, the discretion of the persons who produce these appraisals is likewise important.

Plaintiffs emphasize that the Appraisers' discretion fell within strictly established standards and limits; and was subject to meaningful and significant oversight. This much is apparent. Appraisers, for example, could not decide whether or not to issue a loan. Their discretion lay in one highly circumscribed field, the development of an informed opinion as to the value of a piece of real property. All of Appraisers' various decisions contributed to one ultimate output – the estimated value of a piece of residential real property.

Defendants again cite to *Roe-Midgett*, 512 F.3d 865, for the proposition that independent judgment as to appraisals amounts to a "matter of significance." In *Roe-Midgett*, the Seventh Circuit found that MDAs "routinely use[d] their discretion and independent judgment to make choices that impact[ed] damage estimates, settlement, and other 'matters of significance.'" *Id.* at 874 (citing 29 C.F.R. § 541.207(a)). MDAs "provide[d] claims adjustment services" to insurance companies. *Id.* at 868. The *Roe-Midgett* decision rested on the plaintiff's specific duties as a *quasi* claims adjuster, as opposed to an appraiser. "[T]he MDAs d[id] far more than just appraise damage. They also investigate[d] the [insurance] claim, check[ed] for fraud, decide[d] whether to repair or replace parts, negotiate[d] with body shops, and settle[d] claims up to $12,000." *Id.* at 875. Therefore, the MDAs' discretionary binding authority played a material role in the court's assessment of whether the MDAs' discretion related to a matter of significance. *See also In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119, 1125, 1129 (9th Cir. 2007) (finding claims adjusters' duties fell squarely within description of exempt duties in § 541.203(a) where the claims adjusters in the case (i) determined whether the insurance policy covered a loss, (ii) recommended a reserve upon estimating the employer's exposure on the claim, in accordance with state law requirements, (iii) interviewed the insured and assessed his (or others') credibility, (iv) advised the employer regarding any fraud indicators or the potential for subrogation and underwriting risk, (v) negotiated settlements, (vi) sought additional authority from their supervisors…when the

recommended settlement exceeded their established authority and (vii) communicated with opposing counsel and the employer's counsel; and on average, each adjuster paid approximately $1 million in claims per year, ranging from $2,800 to $8,000 per claim).

Unlike claims adjusters, real estate appraisers typically do not "negotiat[e] settlements" or "mak[e] recommendations regarding litigation." Final Rule, 69 Fed. Reg. at 22,144-45; 29 C.F.R. § 541.203(a). Nor do they interview consumers of a product. Appraisers' duties do not mirror those of claims adjusters in those key respects. Further, Appraisers' discretion, when exercised, does not directly financially impact BofA. Claims adjusters, on the other hand, have been found exempt where they were directly responsible for upwards of hundreds of thousands of dollars per annum. *Farmers Ins. Exch.*, 481 F.3d at 1125. In *Farmers Insurance*, while there were significant numbers of claims adjusters, each individually regularly exercised discretion regarding thousands of dollars in claims settlements.

Appraisers have no similar direct authority to expend LAS of BofA's resources. Indeed, when Appraisers do their job properly, the appraisal has little net effect on the finances of the business. Generally, a great appraisal cannot make LAS or BofA more money. *C.f. Brea v. Heartland Exp., Inc. of Iowa*, 2012 WL 2898993, at *3 (D. Ariz. July 16, 2012) (finding exercise of discretion and independent judgment where plaintiff who planned routes of a trucking company would make decisions to maximize efficiency and save company money, and often operated without supervision). Indeed, the only time that an appraiser can cost the business money is if the Appraiser catastrophically fails in conducting an appraisal, the error is not caught, and BofA must eventually repurchase the loan, or face other legal or business ramifications. But "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly." 29 C.F.R. § 541.202(f). Appraisers' work does not bind LAS or BofA to a particular course of conduct or lending decision. Considering these factors, their work appears to be more similar to a non-exempt inspector or investigator, whose "work involves the use of skills and technical abilities in gathering factual information,

applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met." 29 C.F.R. § 541.203(j).

The fact that appraisals, on the aggregate, are important to the Defendants' business does not in turn mean that the appraisers, individually, exercise discretion with regards to matters of significance. Indeed, the sheer number of appraisals produced highlights the relative importance of guidelines and procedures for Appraisers' work. LAS and BofA have a vested interest in adopting completely uniform procedures. Through adopting these guidelines and regulations, and through the automated and manual review process, LAS and BofA do everything in their power to delimit Appraiser discretion and thereby generate uniform results.[8] Furthermore, Defendants' review the Appraiser reports manually 30% of the time – demonstrating that their exercise of judgment is subject to immediate direction or supervision. 29 C.F.R. § 541.202(c).

In *Campbell*, the Ninth Circuit found an issue of fact as to whether junior accountants were exempt under the administrative exemption, specifically with regards to the "matters of significance" prong. 642 F.3d at 820. In reaching this conclusion, the court considered the auditors' job duties including the fact that:

> Plaintiffs help perform audits for PwC's many clients. These audits ensure the client's financial statements are prepared in accordance with Generally Accepted Accounting Principles (GAAP). The ultimate recipient of PwC's audit work is the client's Board of Directors. In addition to verifying compliance with GAAP, the Attest division also provides professional advice to clients, including identification of deficiencies in the client's accounting practices.

---

[8] Of course, the Court acknowledges that two appraisers appraising the same property will come up with different valuations. However, it is clear that the procedure they must go through to come to those conclusions is highly important to LAS and BofA. By "uniform results" the Court is referring to appraisal forms/reports that contain uniform information, *e.g.*, a certain number of pictures, floor plan, description of the property, 3 comparables that fall within certain conditions, etc.

*Id.* at 823.

The facts in *Campbell* differ significantly from those here. In *Campbell*, the auditor's work went directly to the Board of Directors of an outside client. The auditors provided professional advice to those outside clients with regards to those clients' business. Appraisers' work, on the other hand, is bundled into a loan package – produced on a mass scale – that is eventually passed on to a loan purchaser. The appraisals are not considered by high-level employees at BofA. Moreover, the appraisals do not affect a major policy decision by BofA, such as the nature of the business's accounting practices. The appraisal is simply one factor of many that BofA considers in making one loan.

Applying the factors identified in § 541.202(b) confirms that Appraisers do not exercise discretion with regards to matters of significance. Appraisers do not have the authority to formulate, affect, interpret, or implement management policies or operating practices; they do not carry out "major" assignments *in conducting the operations of the business*; they do not have the authority to *commit* the employer in matters that have significant financial impact; while Appraisers may have to consider issues beyond established guidelines, they generally do not have the authority to "waive" or "deviate from" established policies and procedures without prior approval; they do not have the authority to negotiate and bind the company on significant matters; they do not provide consultation or expert advice to management; they are not involved in planning long- or short-term business objectives; they do not investigate and resolve matters of significance *on behalf of management*; and they do not represent the company in handling complaints, arbitrating disputes or resolving grievances.

Therefore, the Court concludes that there is no genuine issue of material fact as to whether Appraisers exercise independent judgment with regards to matters of significance. Plaintiffs are entitled to summary judgment as to this exemption on this independent basis.

## B. Learned Professional Exemption

The Court now turns to whether Appraisers fall into the learned professional exemption under California or federal law.

### 1.      In General

Under federal law, to qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring "advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301. This primary duty test includes three elements: (1) the employee must perform work requiring advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. *Id.*

Like the administrative exemption, California's standard for the professional exemption is to be construed in accordance with the federal regulations in effect at the time, 29 C.F.R. §§ 541.301, 541.207 (2000). The Wage Order provides that the professional exemption applies to "any employee …who is primarily engaged in an occupation commonly recognized as a learned … profession." Wage Order § 1(A)(3); *Campbell*, 642 F.3d at 825. A "learned profession" means an employee is primarily engaged in (i) work requiring knowledge of an advanced type in a field [of] science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study and (ii) whose work is predominantly intellectual and varied in character. Wage Order § 1(A)(3).

### 2.      Application

Because the final two prongs control the outcome of the third, the Court will address the final two prongs of the test first.

#### a.  Field of Science or Learning/Specialized Course of Study

First, the Court will consider whether Appraisers' work falls into a "field of science or learning" requiring a "specialized course of study."

##### i.      Legal Standard

The phrase "field of science or learning" specifically includes the "traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, [and] pharmacy." 29 C.F.R. § 541.301. The phrase also covers "other similar occupations that have a

recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning." *Id.*

Finally, the phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to "professions where specialized academic training is a standard prerequisite for entrance into the profession." 29 C.F.R. § 541.301. Therefore, "the best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." *Id.* However,

> the word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry.

*Id.* The regulation specifies,

> the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental…processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

29 C.F.R. § 541.301.

The Ninth Circuit has recently weighed in on this exemption. It found that generalized education combined with job training typically does not meet the requirements for the

professional exemption. *Solis v. Washington*, 656 F.3d 1079, 1084-85 (9th Cir. 2011). In assessing whether a social worker was an exempt professional, it wrote:

> While we have not addressed this provision previously, our sister circuits have concluded that positions that do not require a particular course of intellectual instruction directly related to the employee's professional duties do not come within the "learned professional" exemption, even if they also require substantial practical experience. In *Dybach v. State of Florida Department of Corrections*, 942 F.2d 1562 (11th Cir. 1991), the court held that probation officers, who were required to have a bachelor's degree in any field, including "nuclear physics" or "basketweaving," *id.* at 1565–66, did not qualify for the "learned professional" exemption despite a requirement of one year of prior experience in law enforcement or corrections. In *Fife v. Harmon*, 171 F.3d 1173 (8th Cir. 1999), the Eighth Circuit considered the application of the exemption to aviation operation specialists, who were required to have either a bachelor's degree in aviation management or a directly related field, *or* four years of full-time experience in aviation administration, *or* some combination of the two. The court concluded the "learned professional" exemption did not apply because the employees acquired their advanced knowledge "from a general academic education or from an apprenticeship" and not from a "prolonged course of specialized study," *id.* at 1177. In *Vela v. City of Houston*, 276 F.3d 659 (5th Cir. 2001), the court held that emergency medical technicians and paramedics, who were required to complete 200 to 880 hours of didactic training, clinical experience, and field internship, did not satisfy the education prong of the "learned professional" exemption. *Id.* at 676.

*Id.*

The Ninth Circuit compared these cases to *Owsley v. San Antonio Independent School District*, 187 F.3d 521 (5th Cir. 1999), and *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737 (6th

Cir. 2000), in which courts found that state-licensed athletic trainers and funeral directors,

respectively, were "learned professionals." The court highlighted the specific, advanced field of

study required for each profession. *Id.* at 1085 (in *Owsley*, noting that trainers had to have a

bachelor's degree and complete courses of study in the specific areas of (a) human anatomy; (b)

health, disease, nutrition, fitness, wellness, or drug and alcohol education; (c) kinesiology; (d)

human physiology or physiology of exercise; and (e) athletic training; and in *Rutlin*, that the

funeral directors had to get a passing grade on board test in embalming, pathology, anatomy,

and cosmetology); *see also Reich*, 993 F.2d at 743 (game warden found to be exempt

professional where wardens needed a degree in wildlife management or biology in order to

perform the primary duty of the job, where "[the] degrees cover topics such as wildlife values,

habitat, ecology, population management, history of wildlife conservation, ecology of wildlife,

and adaptation of animals to environmental constraints with an understanding of animal

distribution and survival. The degrees required of Wyoming wardens specifically prepare them

for the jobs they are expected to accomplish.").

 "Whether a position requires a degree in a specialized area…or merely a specific course

of study…a 'prolonged course of specialized intellectual instruction' must be sufficiently

specialized and relate directly to the position." *Solis*, 656 F.3d at 1087-88. "An educational

requirement that may be satisfied by degrees in fields as diverse as anthropology, education,

criminal justice, and gerontology does not call for a course of *specialized* intellectual

instruction. Moreover, in this case the net is cast even wider by the acceptance of applicants

with other degrees as long as they have sufficient coursework in any of these fields." *Id.* at

1088 (quotations omitted).

The court in *Solis* also significantly downplayed formal training programs required for

applicants. It found that "[t]he district court [improperly] gave weight to the six-week formal

training program required for accepted applicants." *Id.* The Ninth Circuit noted that a similar

program "was determined to be insufficient in *Vela,* where the court concluded that 880 hours

of specialized training in didactic courses, clinical experience, and field internship did not

satisfy the education prong of the 'learned professional' exemption." *Id.* Therefore, the Ninth

Circuit reasoned "[i]f six weeks of additional training, only four weeks of which is in the classroom, were sufficient to qualify as a specialized course of intellectual instruction, nearly every position with a formal training program would qualify." *Id.* (citing *Vela*, 276 F.3d 659). This cannot be the standard of the learned professional exemption.

### ii.    Analysis

Appraisers must be certified by AQB, the appraisal industry's federally-mandated certification board, which requires Appraisers to complete a specialized curriculum related to real estate appraising.

> The AQB requires appraiser trainees to complete a specialized course of instruction prior to beginning their training. These individuals must complete at least 75 hours of specialized instruction, comprised of 30 hours of basic appraisal principals, 30 hours of basic appraisal procedures, and a 15-hour national Uniform Standards of Professional Appraisal Practice course. Even after satisfying these requirements, a trainee can only work under the supervisor of a certified appraiser….Licensed residential real property appraisers must complete a minimum of 150 hours of core curriculum. This curriculum, among other things, teaches would-be appraisers about approaches to valuing real estate and helps them develop the writing and reasoning skills to create appraisals. It also teaches them about specific topics related to real property, such as how governmental, economic, and social variables influence real estate values, and how to analyze these variables, along with other data, to value real estate.

DUF 12-13.

Appraisers must also pass an AQB-approved examination and attain 2,000 hours of experience as supervised trainee. DUF 13.

> In order for a licensed appraiser to become a certified residential real property appraiser, an individual must hold an Associate's degree (or higher) from an accredited college or community college, or in lieu of an

Associate's degree, successfully pass several collegiate subject matter courses. Applicants must also complete 200 hours of core curriculum relating to appraising and market analysis. And the individual must have 2,500 hours of experience obtained during no fewer than 24 months, and pass the AQB-approved exam. Even after completing the required education, training, and examination, appraisers are also required to complete continuing education coursework.

DUF 15.

Defendants liken Appraisers to other exempt professionals, as "Appraisers render professional opinions through detailed research and independent analysis that have significant consequences for their employers and their employer's clients."[9] Defs. Mot. at 15 (citing *Wagner v. Bank of Am. Corp.*, 2013 WL 3786643 (D. Colo. July 19, 2013) (in considering whether firing plaintiff for reporting USPAP violations could contravene public policy, noting that "[p]eople and institutions rely on appraisals in making important financial decisions")[10]; 29 C.F.R. § 541.301(c) (current) (identifying medical technologists, nurses, dental hygienists, physician assistants, accountants, chefs, athletic trainers, and funeral directors as professionals that presumptively fall within the professional exemption)).

---

[9] The fact that a person generates a "professional opinion" does not render that person a "professional" for the purposes of the exemption. For example, a building inspector may render a professional opinion that a building is uninhabitable, but the building inspector himself may still be non-exempt. *See* Final Rule, 69 Fed. Reg. at 22,150 ("the learned professional exemption is available for lawyers, doctors and engineers, but not for skilled tradespersons, technicians, beauticians or licensed practical nurses, as none of these occupations require specialized academic training at the level intended by the regulations as a standard prerequisite for entrance into the profession").

[10] Defendants' citation to this case somewhat undermines their point. The cited language explains that appraisals are very important – not necessarily appraisers. Taken in context, the case supports the proposition that the USPAP guidelines were extremely important (thus, their violation could potentially raise public policy concerns). This contradicts the theory that Appraisers exercise significant and meaningful discretion and judgment.

However, the examples cited in the regulations do not support Defendants' conclusion. Each profession identified in the regulation can be distinguished from Appraisers based predominately on the amount of education required to enter or participate in the field: medical technologists (requiring 3 years of pre-professional study in additional to a fourth year of professional coursework), nurses (requiring specialized advanced degree), dental hygienists (requiring 4 years of pre-professional or professional study), physician assistants (same), accountants (CPAs qualify, as opposed bookkeepers and others who "normally perform a great deal of routine work"), chefs (who have attained a four-year specialized academic degree in culinary arts), paralegals (generally do not qualify, unless they have an advanced specialized degree in a professional field and apply that knowledge to the performance of their duties), athletic trainers (four year pre-professional and professional study in a specialized curriculum plus certification), and funeral directors (same). *Id.* Appraisers, even certified appraisers, do not need four years of pre-professional specialized education. Class members in this case have degrees in a variety of unrelated fields, not specific to their chosen work.

Considering these examples, the Court finds that Appraisers do not meet the academic qualifications to be "learned professionals" under the second or third prongs of the exemption. First, although an associate's degree or equivalent is required to become a certified appraiser, the coursework is not narrowly focused on the Appraisers' position.[11] *Compare Solis*, 656 F.3d at 1087 n.5 (coursework in unspecified social sciences insufficient to qualify for the professional exemption) *with Owsley*, 187 F.3d 521 (trainers that had to complete courses of study in the specific areas of (a) human anatomy; (b) health, disease, nutrition, fitness, wellness, or drug and alcohol education; (c) kinesiology; (d) human physiology or physiology

---

[11] The Court will consider the higher certification for the sake of argument. Generally, in applying the test for the professional exemption, courts will consider "the most lenient" academic standard required to qualify for a position. *Owsley*, 187 F.3d at 524.

of exercise; and (e) athletic training qualified for the exemption). Appraisers, even certified appraisers, are not required to hold a specialized degree related to their position.

In addition, job-specific training is insufficient to make real-estate appraisal, if it were considered work "requiring advanced knowledge," a "field of science or learning." Defendants cite to the two hundred hours of core curriculum relating to appraising and market analysis that certified appraisers must complete. However, this is more comparable to on the job training than specialized, intellectual instruction. *See Solis* at 1088 (four weeks of classroom training does not qualify as a specialized course of intellectual instruction). Two hundred hours of "core curriculum" equates to approximately five, forty-hour weeks of instruction. The courses are not directed at teaching an advanced course of study, rather, they reinforce basic professional skills and train on the specific skills required for the job. Thus, the courses are more analogous to job training than specialized education. Defendants' description of the core curriculum reinforces this conclusion. DUF 13 (courses "help[] [Appraisers] develop … writing and reasoning skills" and learn to weigh variables to develop real-estate values).

Defendants in oral argument cited to Appraisers' continuing education requirements. DUF 70. However, ongoing training requirements are insufficient to qualify the field for the professional exemption. Continuing education in a field that is not, in the first instance, one of science or learning, does not become one by virtue of additional training. In other cases where courts have considered continuing education requirements, they have done so in light of underlying educational requirements. *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 591-92, 597 (E.D. Cal. 2008) *adhered to*, 287 F.R.D. 615 (E.D. Cal. 2012) (not reaching the professional exemption, but noting employer generally required a degree in accounting, finance or computer science, in addition to annual training requirements); *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 543–46 (7th Cir.1999)) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) (finding educational requirement for accountant met based on employee's B.S. in Mathematics and the twenty hours of continuing education required by his employer). Appraisers have no similar degree requirement.

Finally, the requirement of extensive supervised training also does not constitute specialized instruction. "[T]he regulation states clearly that the exemption does not apply to 'occupations in which most employees have acquired their skill by experience.'" *Solis*, 656 F.3d at 1088 (quoting 29 C.F.R. § 541.301(d)). A period as a "supervised-trainee" must still be accompanied by specialized instruction.

As the Ninth Circuit has repeatedly held, "FSLA exemptions are construed narrowly against employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit, and the employer has the burden of showing that a particular exemption applies." *Solis*, 656 F.3d at 1088 (citations omitted). Considering this posture, Defendants have not met their burden of showing that the professional exemption applies.

Therefore, the Court concludes that, based upon the undisputed facts, Appraisers work does not fall into a "field of science or learning" requiring a "specialized course of study." Summary judgment as to this exemption is appropriate.

### b.  Advanced Knowledge

Having concluded that Appraisers do not work in a field of science or learning requiring a specialized course of study, the Court will not reach the question of whether their work required "advanced knowledge."

### C.  Highly-Compensated Employee Exemption

Even after concluding that Appraisers do not qualify for either the administrative or professional exemption, the Court must consider whether Appraisers fall under the highly-compensate employee exemption.

Because "[a] high level of compensation is a strong indicator of an employee's exempt status," under the FLSA, it eliminates "the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601. Therefore, "[a]n employee with total annual compensation of at least $100,000 is deemed exempt … if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601.

Defendants argue that, even if the Court does not find that Appraisers independently satisfy either the administrative or professional exemptions, they nonetheless perform regularly at least one of the exempt duties of an administrative or professional employee. The parties agree that Appraisers had only one duty: conducting appraisals and generating appraisal reports. Nevertheless, Defendants maintain that if the Court does not find that this satisfies the primary duties tests above, the Appraisers' duty can be deconstructed – and parts of that primary duty can be found to be exempt as meeting part of one of the duties prongs. Defendants' argument is essentially that, in generating reports, Appraisers have to engage in research (or another administrative or professional-*esque* activity), and research is similar to some part of an exempt activity; therefore Appraisers "customarily and regularly" perform one or more of an administrator's or professional's exempt duties or responsibilities. Plaintiffs argue that Appraisers' one duty does not meet either "duties" prong of the administrative exemption or the professional exemption, therefore, the highly  compensated employee exemption does not apply.

Defendants give no support for their expansive reading. Deconstructing Appraisers' duty into component parts that may align with part of an exempt administrative or professional duty would allow nearly any employee who earns over $100,000 per year to be classified as exempt. No court has found this exemption to apply based on breaking down one job duty into component parts to meet a part of a "duties prong." Rather, other courts considering the issue have looked at discrete and separate duties that employees perform, and assessed whether that duty meets a "duties prong" of an exemption. *See, e.g.*, *McCoy v. N. Slope Borough*, 2013 WL 4510780, at *11-12 (D. Alaska Aug. 26, 2013) (applying the highly compensated employee exemption, considering multiple positions, finding the search and rescue [SAR] coordinator who spent about 80 percent of his time on tasks "directly related to the management or general business operations of SAR" and only about 20 percent of his time flying, and pilot who flew in emergency situations thereby exercising discretion and independent judgment with regard to matters of significance, met one of the duties prongs of the administrative exemption and thereby qualified for the highly compensated employee exemption); *Mohorn v. Tennessee*

*Valley Auth.*, 2007 WL 2077549, at *8 (E.D. Tenn. July 17, 2007) (concluding plaintiff RadCon Supervisors were not exempt based on "overseeing their RadCon technicians and ensuring that they perform their work in accordance with applicable procedures" because "they primarily engage in document review and otherwise occasionally engage[d] in task prioritization and the conducting of performance reviews").

Consistent with these cases, the Court believes that Appraisers' duties must be viewed as separate whole tasks for the purposes of the § 541.601 exemption. At least one regularly performed duty or task must fall squarely within the professional exemption or one of the "duties" prongs of the administrative exemption. Therefore, because Appraisers have only one duty (appraising real property), and Appraisers' primary duty does not meet any prong of either exemption, Appraisers do not customarily and regularly perform the exempt duties or responsibilities of administrative or professional employees.

That is not to say that this exemption could never apply. A counterfactual is helpful for understanding the appropriate reach of the highly-compensated employee exemption. Had Appraisers regularly advised management on the policies of the company, given their experience conducting appraisals, the Court could have concluded that (1) advising management on Defendants' policies was not Appraisers' primary duty, but (2) Appraisers had a separate and distinct job duty of regularly and customarily advising on policy and (3) advising management on policy was an exempt duty under the "directly related" prong of the administrative exemption. Therefore § 541.601 would apply. However, unlike our hypothetical, Appraisers in this case do not in fact have a variety of different job duties. They perform one task that falls under neither duties prong of the administrative exemption, nor the professional exemption. Therefore, the Court finds as a matter of law that § 541.601 does not apply.

### D. Conclusion

The Court concludes for the foregoing reasons that Appraisers were erroneously classified as exempt from overtime under state and federal law, when they should have been classified as non-exempt. Having found as much, the Court next considers Defendants' motion for summary judgment as to the meal and rest period claim, the itemized wage statement claim,

and waiting time penalties claim. Finally, it will consider arguments as to Defendants' scienter, whether Defendants acted in "good faith" under state law, or "willfully" under federal law.

### IV.   Meal Period and Rest Period Claim

Plaintiffs also seek to recover for meal and rest period violations under California Labor Code § 226.7. Having concluded Appraisers were not properly classified as exempt, the Court will consider whether Plaintiffs have raised an issue of fact as to whether Defendants have violated § 226.7.

#### A. Legal Standard

California law requires employers to provide meal periods and authorize and permit their employers to take rest breaks. Cal. Lab. Code § 512 ("An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes."); Wage Order § 11 (same), § 12 ("Every employer shall authorize and permit all employees to take rest periods."). Section 226.7 provides that "[a]n employer shall not require an employee to work during a meal or rest or recovery period." Cal. Lab. Code § 226.7.

The California Supreme Court recently interpreted this statute. "An employer's duty with respect to meal breaks [] is an obligation to provide a meal period to its employees." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1040 (2012). The court found that "[t]he employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30–minute break, and does not impede or discourage them from doing so." *Id.* However, "the employer is not obligated to police meal breaks and ensure no work thereafter is performed." *Id.* Put another way, "the California Supreme Court clarified that an employer is required to make uninterrupted meal periods and rest breaks available, but is not obligated to ensure that they are taken." *Dailey v. Sears, Roebuck & Co.*, 214 Cal. App. 4th 974, 1000 (2013). "On the other hand, an employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks." *Brinker*, 53 Cal. 4th at 1040 (citing *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949, 962–63 (2005)).

"Proof an employer had knowledge of employees working through meal periods will not alone subject the employer to liability for premium pay; employees cannot manipulate the flexibility granted them by employers to use their breaks as they see fit to generate such liability." *See Brinker*, 53 Cal. 4th at 1040. Therefore, if there is no evidence that an employer pressured or coerced plaintiff to skip otherwise provided meal breaks, summary judgment as to allegedly missed meal breaks is appropriate. *White v. Starbucks Corp.*, 497 F. Supp. 2d 1080, 1089 (N.D. Cal. 2007).

Courts have wrestled with this standard in situations where employees have significant flexibility in their work. For example, in *Bradley v. Networkers International, LLC,* the California appeals court found class certification appropriate on the issue of meal and rest breaks for employees who worked in maintenance and repair on cell sites. *Bradley v. Networkers Int'l, LLC*, 211 Cal. App. 4th 1129, 1150 (2012). The defendant was a business that provided technical personnel services to the telecommunications industry. Its employees often worked in the field. In *Bradley*, the defendant company had no written policy regarding meal and rest breaks for its employees. *Id.* Its employees reported that the employer did not permit employees to leave a job site until a problem was fully resolved, or else be faced with immediate termination. *Id.* at 1137. Employees believed that they would be fired if they stopped working to take a break. The defendant admitted that it did not have a rest or meal break policy. The defendant in that case argued that "the workers *must have* taken breaks because they worked alone for long periods of time." *Id.* However, the court noted that "[Defendant] did not present *any evidence* showing it had a formal or informal practice or policy of permitting the required breaks or that any worker believed he or she was entitled to take a legally-required rest or meal break, or that some or all workers took these breaks." *Id.* at 1150.

In *Ricaldai v. U.S. Investigations Servs., LLC*, the district court concluded that summary judgment as to the meal break and rest period claim was inappropriate where "a reasonable juror might find that [defendant's] policies and practices unlawfully discouraged Ricaldai from taking the required *duty-free* meal periods." 878 F. Supp. 2d 1038, 1043 (C.D. Cal. 2012).

Ricaldai worked as a field investigator for the defendant U.S. Investigation Services ("USIS"). The record showed that "field investigators typically worked remotely out of their homes and with a company car, gathering records, conducting interviews, and preparing written reports." *Id.* at 1039. The employer had a written policy which stated "Do not start work early, finish work late, work during a meal break or perform any other extra or overtime work unless you are authorized to do so." *Id.* at 1040. In addition, it argued "Ricaldai had complete control over her schedule, given her remote work and the availability of overtime." *Id.* at 1043. Nevertheless, Ricaldai argued that she was pressured to work through her meal period. The record showed that she was told by her trainer to work while she ate, was instructed that it was not okay to conduct any personal errands during the day, and she had to maximize her time in any particular "zone" to try to get as much work done as possible. *Id.* at 1040. The record in *Ricaldai* included substantial evidence that the employer expected its employees to work through lunch, and that "it was not possible for [her] to take 30 minutes of off-duty time during the day because it was the culture of the job to get as much testimony as possible." *Id.*

Thus courts, in applying the *Brinker* test, must conduct a fact-intensive inquiry to determine whether employers provide a "reasonable opportunity" to take an uninterrupted 30-minute break. There is no requirement that an employer have a formal written policy, although the existence of such a policy can be used as evidence to support the fact that breaks were made available. However, a formal policy will not be controlling where it is otherwise shown that an employer pressured or coerced employees to skip breaks.

### B. Analysis

Defendants argue that because Appraisers can set their own schedules in completing appraisals, meal and rest breaks are made available to them. Defs. Mot. at 18. Evidence supports the fact that Appraisers work from home, have discretion over what activities to complete when, and have some discretion over their work load.

However, Ms. Parks has testified that the demands of the work were rigorous with regards to the turn-times of the appraisals. She asserts that Appraisers in fact often had no time to take meal or bathroom breaks, despite being able to set their own schedules. Parks Dep.

225:7-226:6. She also notes that her boss directed her to eat in the car if she did not have enough time to take a meal break. *Id.* at 227:5.  In oral argument, Plaintiffs noted that numerous Appraisers from the class provided declarations regarding the availability of breaks. *See* Declarations in Support of Motion to Certify Class (Dkt. 118). For example, Timothy Barnette declared that he "was never informed that [he] was entitled …to take meal breaks or paid rest breaks" and that he "often work[ed] for long stretches" without breaks, and "ate in [his] car while working on reports or driving to or from an inspection." Barnette Decl. (Dkt. 118-5) ¶ 16. In addition, Defendants did not have a formal "break" policy.

Defendants in their reply assert that the testimony of one employee, Ms. Parks, is insufficient to avoid summary judgment as to the issue of meal and rest breaks, and a formal break policy is unnecessary in light of Appraisers' work flexibility.

The Court finds that there is an issue of fact as to whether meal breaks are "provided" and short breaks "made available" to Appraisers. A finder of fact could look at the testimony that Appraisers often felt pressured by the expectations of the employer to work for long stretches without breaks and conclude that, despite the flexibility generally provided to appraisers, there was not a "reasonable opportunity" to take uninterrupted 30-minute breaks. Appraisers have reported that they felt pressured to produce reports in relatively short turn-times that foreclosed a meaningful opportunity to take breaks. Failure to meet these expectations could result in termination. This case is analogous to *Ricaldai*, where the court found that there was an issue of fact as to whether the policy and practices of the company discouraged employees from taking breaks. Based on this evidence, a jury could find a culture or policy which makes taking a 30-minute break during the day infeasible.

The Court acknowledges that Appraisers are able to control – to some meaningful degree – the amount of work that they receive. In addition, Appraisers and Defendants understand that Appraisers may structure their days independently in order to complete their assignments. Still, as explained above, there is evidence that the culture of the company means that Defendants' policy does not "permit [employees] a reasonable opportunity to take an

uninterrupted 30–minute break." Further, in light of the contradictory testimony, there is an issue of fact as to whether short breaks are affirmatively "authorized and permitted."

Therefore, summary judgment is DENIED as to the meal and rest period claims.

## V. Willfulness/Good Faith

Determination of the remaining state law claims and the issue of willfulness under the FLSA all turn generally on whether Defendants had a good faith basis for concluding that Appraisers were exempt. The Court will address the legal standards applicable to each claim and collateral legal issues separately, and will analyze the "good faith" or "willfulness" issue together.

### A. Itemized Wage Statement Claim

Defendants move for summary judgment as to Plaintiffs' claims for failure to produce an itemized wage statement under California Labor Code § 226.

#### 1. Legal Standard

Section 226 requires employers to provide an itemized wage statement detailing each of nine separates items, including the total hours worked and applicable hourly rate. *Id.* § 226(a)(2), (9). "[A] claim for damages under Section 226(e) requires a showing of three elements: (1) a violation of Section 226(a); (2) that is 'knowing and intentional'; and (3) a resulting injury." *Willner v. Manpower Inc.*, 35 F. Supp. 3d 1116, 1128 (N.D. Cal. 2014) (citing *Reinhardt v. Gemini Motor Transp.*, 879 F. Supp. 2d 1138, 1141 (E.D. Cal. 2012)).

#### 2. Analysis

Defendants apparently do not dispute that the total hours worked and hourly rate were missing form Plaintiffs' wage statements. Defs. Mot. at 20. Nevertheless, Defendants move for summary judgment on two grounds. Defendants' focus on the second and third element. The Court will address the injury requirement first.

##### a. Harm

Defendants argue that Plaintiffs could not have been harmed by the omissions from their wage statement, because Appraisers knew they were classified as exempt when they began working. Therefore, the omission of the total hours worked and hourly rate was immaterial to

them. Plaintiffs respond that the 2013 amendment to § 226 clarified that the injury requirement
is satisfied by a violation of § 226(a).

The amendment clarified that the injury requirement is presumptively satisfied if the
employer fails to provide accurate and complete information as required by:

> any one or more of items (1) to (9)…and the employee cannot promptly
> and easily determine from the wage statement alone one or more of the
> following: (i) The amount of the gross wages or net wages paid to the
> employee during the pay period or any of the other information required to
> be provided on the itemized wage statement pursuant to items (2) to (4),
> inclusive, (6), and (9) of subdivision (a).

Cal. Lab. Code § 226(e)(2)(B). Therefore, according to the text of the statute, in this situation
the injury requirement would be satisfied, as Defendants admit material under items (2) and (9)
was not readily discernable.

Defendants' arguments against a straightforward, textualist reading of the statue are
unpersuasive. Defendants cite to *Loud v. Eden Med. Ctr.*, 2013 WL 4605856, at *10 (N.D. Cal.
Aug. 28, 2013), to establish that Plaintiffs must still establish independent injury. However, the
case did not directly reach the impact of the 2013 amendment. *Id.* (the court finding it need not
determine whether the 2013 amendment applied retroactively because plaintiff could not show
any deficiency in the paychecks regardless of which definition of injury applied). Further, *Loud*
primarily relies on *Escano v. Kindred Healthcare Operating Co.*, 2013 WL 816146, at *11
(C.D. Cal. Mar. 5, 2013), which confirms that the amendment simply codified the established
law that an employee who "cannot promptly and easily determine from the wage statement
alone" requirements under § 226(a) has suffered an injury. *Escano*, 2013 WL 816146, at *11
(citing cases). Therefore, because Plaintiffs have shown that they could not readily determine
the total hours worked and applicable hourly pay, which made it difficult for them to determine
the amount of overtime worked, Plaintiffs have adequately met the "minimal" injury
requirement under § 226. *Id.*

### b.  Knowing and Intentional

Second, Defendants argue that failure was not "knowing and intentional" because LAS had a good faith belief that Plaintiffs were properly classified as exempt. Plaintiffs respond that, even if Defendants did not know of the illegality of the action, they still "intentionally" provided wage statements that did not show hours worked. Pls. Opp'n at 23.

"[T]he phrase 'knowing and intentional' in Section 226(e)(1) must be read to require something more than a violation of Section 226(a) alone." *Willner*, 35 F. Supp. 3d at 1130-1131. That is, an employer cannot be held liable on a strict liability basis.

In *Willner*, the court concluded that "[plaintiff] is not required to demonstrate that [defendant] knew that this conduct, if otherwise proven, was unlawful." *Willner*, 35 F. Supp. 3d at 1131-32. In that case, defendants failed to put their address and the pay period start date on the wage statements. The court noted that this mistake as to what the law required could easily have been remedied – the Division of Labor Standards Enforcement posted an exemplar wage statement on its website. *Id.* The court therefore concluded that evidence supported a knowing and intentional violation, as the defendant knew or should have known that the conduct was unlawful. *Id.* Similarly in *Perez v. Safety-Kleen Sys., Inc.*, 2007 WL 1848037, at *9 (N.D. Cal. June 27, 2007), the defendants knowingly misstated the number of hours worked, where it clearly could verified the requirements of the law. Therefore, a violation is "knowing an intentional" where the defendants knew or should have known that their conduct violated the law.

Considering the requirement that a violation be both "knowing" and "intentional," the Court concludes that if Defendants had a good faith belief that the Plaintiffs were properly classified as exempt (and therefore § 226 inapplicable), Defendants did not "knowing[ly] and intentional[ly]" fail to provide adequate wage statements. *See Reber*, 2008 WL 4384147, at *9. In essence, a good faith defense precludes liability under the "knowing and intentional" standard because the defendant arguably had no way of knowing that its conduct was unlawful. Penalizing employers who, in good faith but ultimately incorrectly, believe that their employees

are exempt, and on this basis do not comply with § 226, is inconsistent with the requirement that a violation be "knowing and intentional."

Thus, liability turns on whether Defendants' belief that its employees were exempt was in good faith. Because Defendants raise the same defense against Plaintiffs' waiting time penalties claim and as to the FLSA statute of limitations and liquidated damages, the Court addresses the evidence going to the good faith defense in Section V.D.

### B. Waiting Time Penalties

Plaintiffs argue that Appraisers are owed waiting time penalties for Defendants' willful failure to pay all wages due upon discharge, under California Labor Code § 203. Defendants move for summary judgment on this claim on the grounds that Defendants' action was not "willful," as Defendants had a good faith legal defense. Plaintiffs respond that a "good faith" legal defense is unavailable here.

Section 203 provides that: "If an employer willfully fails to pay ... any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days..." "[T]o be at fault within the meaning of [section 203], the employer's refusal to pay need not be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due. As used in section 203, 'willful' merely means that the employer intentionally failed or refused to perform an act *which was required to be done*." *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 325 (2005) (quoting *Barnhill v. Robert Saunders & Co.* 125 Cal. App. 3d 1, 7 (1981)). However, a good faith belief in a legal defense will preclude a finding of willfulness. *Id.*

"The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist." *See Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1201 (2008). "Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.'" *Id.* In *Amaral*, the court considered whether "defenses presented were supported by evidence and a reasonable interpretation of the law." *Id.* In concluding that it was, the court

noted that the legal obligations imposed on employers were unclear at the time of the violations." *Id.*

Whether the defense was presented in good faith will be addressed in Section V.D below.

### C. FLSA Statute of Limitations and Liquidated Damages

Defendants contend that Plaintiffs cannot prove that they acted with the requisite scienter in order to be subject to an extended statute of limitations and liquidated damages on Plaintiffs' FLSA claims.

Successful FLSA plaintiffs can recover for unlawfully withheld overtime pay for two years back from the filing date of a cause of action. 29 U.S.C. § 255(a). "When a violation is 'willful,' however, the statute of limitations extends to three years." *Haro*, 745 F.3d at 1258.

For an employer's violation to be "willful" under the FLSA, such that a three-year statute of limitation applies, "an employer need not knowingly have violated the FLSA; rather, the three-year term can apply where an employer disregarded the very 'possibility' that it was violating the statute." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003) *aff'd*, 546 U.S. 21 (2005). However, the Court "will not presume that conduct was willful in the absence of evidence." *Id.*

In *Haro*, the Ninth Circuit found that there was evidence to support the district court's finding that the City's conduct was willful. In that case, the Ninth Circuit noted that "the City ha[d] extensively litigated the meaning of § 207(k)" as to other positions, "[y]et at no time thereafter did the City take any steps to obtain an opinion letter from the Department of Labor regarding Plaintiffs' positions, although it had done so as to other employees." *Haro*, 745 F.3d at 1258. Further, there was evidence that "the [employer] itself appears not to have viewed dispatchers as 'engaged in fire protection' [under § 707(k)] until this case was underway." *Id.*

If the Court finds that Defendants did violate the FLSA, Defendants also seek summary judgment that violation was in good faith and that they had reasonable grounds to believe that their policies complied with the FLSA.

Under 29 U.S.C. § 260,

> In any action commenced . . . to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938 . . . , if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

To satisfy § 260, a FLSA-liable employer bears the burden of proving that it acted in subjective good faith and had objectively reasonable grounds for believing that the acts or omissions giving rise to the failure did not violate the FLSA. This is a "difficult" burden, "with double damages being the norm and single damages the exception." *Alvarez*, 339 F.3d at 910. Where the employer "fails to carry that burden," the Ninth Circuit has noted, "liquidated damages are mandatory." *Id.*

### D. Analysis of Willfulness/Good Faith

As to the state law claims, Defendants must show that the defenses presented a good faith dispute. However, if a defense "under all the circumstances, [was] unsupported by any evidence, [was] unreasonable, or [was] presented in bad faith" that "will preclude a finding of a 'good faith dispute.'" *Amaral*, 163 Cal. App. 4th at 1201.

Defendants' actions may be willful under FLSA if an "employer disregarded the very 'possibility' that it was violating the statute." And to satisfy § 260, a FLSA-liable employer bears the burden of proving that it acted in subjective good faith and had objectively reasonable grounds for believing that the acts or omissions giving rise to the failure did not violate the FLSA.

Defendants argue that the law was "unclear" as to whether Appraisers were exempt. Defendants point out, and the Court has acknowledged, there is no controlling case law in the Ninth Circuit on the specific issue of whether real estate appraisers were exempt under the

FLSA and California wage-and-hour laws. Thus, Defendants argue that their decision to classify Appraisers as exempt under the administrative or professional exemptions, even if ultimately incorrect, reflected a reasonable, non-frivolous, view of existing law.

Plaintiffs point to the following evidence as creating an issue of fact as to Defendants' willfulness or lack of good faith: (1) that Defendants apparently considered classifying Appraisers as exempt, but chose not to, Nicholson Dep. 177:24-181:7 (BofA legal department circulated FLSA questionnaire and made determination of how to classify appraisers); (2) that the existing law, including a 1986 DOL Opinion Letter on appraisers and 2009 Second Circuit case affecting underwriters (*Davis v. JP Morgan Chase*) indicated that Appraisers would not be exempt; and (3) at least one of Defendants' competitors had classified appraisers as exempt after the *Davis* decision. The Court agrees that, taken together, this evidence creates a factual issue as to Defendants' willfulness or good faith.

Taken alone, the fact that Defendants evaluated the exempt status of Appraisers cannot be used to infer that the legal violation was willful. To do so would discourage employers from carefully considering classifications. However, the Court notes that Defendants failed to seek their own DOL opinion regarding Appraisers' classification, despite their knowledge of the murky state of the law.

As to the state of the law, the Court agrees that the existing law did not support the non-exempt position. Defendants were aware of the 1986 DOL Opinion letter, which stated that "appraisers" were not exempt under the administrative exemption. The facts presented are as follows:

> You state that in making their appraisals of taxable property the appraisers work under the supervision of the appraiser assistant. In classifying the property the appraisers use illustrated guidelines and established standards. For example, the appraisers are provided with illustrations of houses which typify the various appraisal classifications. Where an appraiser is assigned to appraise a house which does not fit into one of the classifications, the appraiser must obtain verification of the appraisal by the appraiser assistant.

> An appraiser must successfully pass an examination required for
> registration by the Board of Tax Professional Examiners, and be designated
> as a Registered Professional Appraiser.

Opin. Ltr. Fair Labor Standards Act (FLSA), DOL Wage & Hour Div., 1986 WL 1171077, at *1 (Feb. 25, 1986). After citing the applicable regulation, the DOL concluded "[b]ased on the information provided on this matter, it is our opinion that the appraisers are not using the requisite discretion and independent judgment in their work and cannot qualify for exemption as bona fide administrative employees under section 13(a)(1) of FLSA and section 541.2 of the regulations." Based on this rather cursory analysis, the letter imparts little persuasive value, but was nevertheless an indicator that Appraisers are non-exempt.

Plaintiffs also cite to a Second Circuit case in 2009, *Davis v. J.P. Morgan Chase*, which Plaintiffs argue had a significant impact on the industry. *Davis* held that an underwriter for a bank whose job it was to evaluate whether to issue loans to individual applicants was non-exempt. *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009). The Court wrote:

> Underwriters at Chase performed work that was primarily functional rather
> than conceptual. They were not at the heart of the company's business
> operations. They had no involvement in determining the future strategy or
> direction of the business, nor did they perform any other function that in
> any way related to the business's overall efficiency or mode of operation. It
> is undisputed that the underwriters played no role in the establishment of
> Chase's credit policy. Rather, they were trained only to apply the credit
> policy as they found it, as it was articulated to them through the detailed
> Credit Guide.

*Davis*, 587 F.3d at 535. *Davis* reinforces the Court's reasoning above, and is consistent with the wide body of law that leads to a conclusion that Appraisers are non-exempt.

Finally, Defendants were aware, or at least suspected, that Wells Fargo classified its appraisers as exempt. Mr. Nicholson testified that he was personally aware that Wells Fargo changed employer compensation as a result, he presumed, of reclassification. Nicholson Dep. at

181:11-183:9. This evidence of Mr. Nicholson's individual knowledge does not establish an industry-wide practice, however, it can lead to an inference that Defendants believed some in the industry had reclassified their appraisers.

Based on this evidence, Plaintiffs argue that there is an issue of fact as to whether Defendants' conduct regarding employers' legal defense was in good faith. Plaintiffs rely on *Lopez v. United Parcel Serv., Inc.*, 2010 WL 728205, at *9 (N.D. Cal. Mar. 1, 2010), where the court denied defendant's motion for summary judgment as to wage statement and waiting time penalties claims based upon a "good faith" defense. The court determined that "[defendant] UPS [could not] carry its burden on summary judgment simply by asserting in a conclusory fashion in an argumentative pleading that it acted under a good faith belief plaintiff was exempt." *Id.* It continued that "[t]he presence or absence of a good faith belief on UPS's part is a factual question that must be resolved at trial." *Id.*

Similarly here, while Defendants' defense is facially plausible, there is scarcely more than Defendants' bare assurance that they really believed that the exemptions applied. That is insufficient to prevail on summary judgment. While the evidence is sparse, there remains an issue of fact as to whether Defendants' defense was "good faith" in light of, among other things, their failure to get a DOL opinion letter and knowledge that at least one competitor had reclassified its appraisers as exempt.

Based upon the facts detailed above, applying the FLSA standard, the Court finds that there is evidence to support a finding that Defendants "recklessly disregarded" the possibility that they were violating FLSA. Defendants knew that the classification of employees in the financial services industry was contested, but failed to seek an opinion letter as to the Appraisers' status from the DOL. Further, at least one manager knew that a competitor had reclassified its appraisers as non-exempt, which could be considered a red flag. The evidence is not overwhelmingly in Plaintiffs' favor, by any means. However, facts could support an inference that Defendants recklessly disregarded the possibility that they were violating the FLSA. Therefore, the Court finds that this is not an issue appropriate for resolution on summary judgment.

For the reasons above, there is evidence that draws into question whether Defendants had an objectively reasonable grounds for believing that Appraisers were exempt. Further, Defendants have not provided evidence showing that it took the steps necessary to ensure FLSA compliance.

Defendants have not met their burden on summary judgment. For the reasons above, Defendants are not entitled to summary judgment as to the itemized wage statement and waiting time penalties claims. In addition, summary judgment as to willfulness, good faith, and reasonable grounds under the FLSA is inappropriate.

## VI.   PAGA Penalties

Defendants argue that the Court should exercise its discretion to award less than the maximum civil penalty under PAGA. This is not the appropriate juncture to resolve this issue, and there is no indication that imposing such penalties would be "unjust, arbitrary, oppressive, or confiscatory." Cal. Lab. Code § 2699(e)(2). This denial is without prejudice, and the Court may consider this issue after trial.

## VII.   Disposition

For the reasons stated above the Court finds:

- Summary judgment should be entered for Plaintiffs and against Defendants as to the application of the state and federal administrative exemptions. The exemptions are inapplicable.

- Summary judgment should be entered for Plaintiffs and against Defendants as to the application of the state and federal professional exemptions. The exemptions are inapplicable.

- Summary judgment should be entered for Plaintiffs and against Defendants as to the highly-compensated employee exemption. The exemption is inapplicable.

- Summary judgment is denied as to Plaintiffs' meal and rest period claims.

- Summary judgment is denied as to Plaintiffs' itemized wage statement, and waiting time penalties claims as there are issues of fact regarding Defendants' "good faith" legal defenses.

- Summary judgment is denied as to the issue of willfulness for the purposes of the two-year statute of limitations and liquidated damages.
- Summary judgment as to the issue of PAGA penalties is denied.

DATED:  May 6, 2015

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE